IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

UNITED STATES OF AMERICA,　　　:

v.　　　　　　　　　　　　　　　:　　CRIMINAL CASE NUMBER:

DEMETRIUS ALAN BAXTER,　　　:　　1:21-CR-417-JPB-JSA

## REPORT AND RECOMMENDATION

Defendant received a controlled delivery of a package that originally contained narcotics and he was arrested as he opened that package in a parking lot near his residence. He subsequently made incriminating statements to law enforcement and the officers searched his home based on his alleged consent to search. The case is before the undersigned on the Defendant's Motions to Suppress the proceeds of the warrantless search of his home [28] and his statements [29].

On the basis of the evidence adduced at the evidentiary hearing, as explained in detail below, the Court **RECOMMENDS** that the Motion to Suppress Evidence [28] be **GRANTED** and that the Motion to Suppress Statements [29] be **GRANTED** in limited part, that is, as to any pre-*Miranda* questioning, but otherwise be **DENIED**.

## I.      FACTS

On September 24, 2021, the United Postal Service ("UPS") surrendered to law enforcement a package that UPS had found to contain heroin, cocaine and fentanyl. Transcript, Evid. Hearing, March 28, 2022 [36][37] ("Tr.") at 9-10, 25. The package had been scheduled to be delivered to "James Jones" at 1740 Century Circle, Apt. 1263, Chamblee, Georgia. *Id.* at 9-10, 41. After receiving the package, agents with the U.S. Department of Homeland Security removed the narcotics and replaced them with dummy, inert, substances, along with a trip sensor to alert them as to when the package was opened. They resealed the package and planned to make a "controlled" undercover delivery to the Chamblee location. *Id.* at 9-11, 61. Task Force Officer Sheree Reynolds applied for and received an anticipatory search warrant to allow the agents to search the apartment to retrieve the package once the trip wire or other sensors indicated that that package had been opened inside the apartment. *Id.* The officers, posing as UPS delivery personnel, thus delivered the package on September 29, 2021 to the Chamblee apartment, and an individual later identified as the Defendant greeted them at the door and took the package. *Id.* at 12-15.

TFOs Reynolds and Witkowski, who were surveilling the operation from an unmarked vehicle, saw the Defendant leave the apartment approximately 10 minutes later with the package in hand. *Id.* at 13-14, 58-60. The Defendant entered

a car and drove to a close-by parking lot. *Id*. at 14, 61-62. As the officers saw Defendant inside the car handling the package, the trip wire sensor alerted to indicate that the package had been opened. *Id*. The officers saw Defendant appearing to show the contents of the opened package to someone else by video call on his cell phone. *Id*.  at 14.

As the Defendant began to drive off, his car was intercepted by the officers. *Id*. at 15. Approximately six officers approached the car, initially with pistols drawn. *Id*. at 63, 82. After a few seconds, after the Defendant cooperatively exited the car and was secured with handcuffs, all weapons were holstered. *Id*. at 16-17, 63-65.

TFO Reynolds approached Defendant as he was secured outside his vehicle. According to Reynolds, she saw some marijuana sitting on the roof of Defendant's car. *Id*. at 17-18. She testified that she asked him whether he had more marijuana at his apartment, and he said "yes" *Id*. Reynolds testified that she asked Defendant whether he would be willing to allow officers to retrieve the marijuana from the apartment, and that Defendant again said, "yes." *Id*. Although later interactions with Defendant were recorded, this initial exchange that Reynolds attested to was not recorded.

Reynolds and Witkowski then brought Defendant into the back of an unmarked car, and Witkowski recorded what followed on his cell phone. *Id*. at 20,

66, 82-83. The recording was introduced into evidence in digital form as Gov't Ex. 1[1].

Witkowski began by noting the time (4:29 pm) and then Reynolds introduced herself, and said "I'm gonna read you something and then we can go from there, ok?" Gov't Ex. 1 at 0:13-0:20. Reynolds then read standard *Miranda* warnings, apparently from a pre-printed card. *Id*. at 0:13-0:24, Tr. at 7. After reading Defendant his rights, Reynolds asked him whether he understood those rights, and Defendant responded, "yes." Gov't Ex. 1 at 0:48-0:58. Reynolds asked, "do you wish to talk to us at this time without a lawyer." *Id*. Defendant responded, "Uh I don't have, uh, naw, I'd have to get a lawyer." *Id*.[2]

Reynolds then clarified or repeated her question, by asking, "ok, but the question is… do … are you willing to talk to us without an attorney." *Id*. at 00:59-1:18, Tr. at 22. Defendant replied, "uh, yes, I guess, yeah. Do I have to like, what do I have to say? Yes, I'm willing, I guess." *Id*. Reynolds then stated, "just like what I read to you, if there is something you are not willing to answer, you don't have to answer." *Id*.

---

[1] No party apparently prepared a transcript of this recording. Rather, both sides cite to portions of the audio recording by counter number range.

[2] Defendant's brief quotes this statement slightly differently, as including the phrase "I have to get a lawyer," as opposed to "I'd have to get a lawyer." The Court does not perceive the outcome of the motions to turn on this difference, but finds from its own listening of the recording that the Government's quotation ("I'd have to") is more accurate.

Reynolds then asked Defendant various questions about the apartment itself, including "do you have any other dope at the apartment," to which Defendant said, "yes." *Id*. at 1:31-1:50. Reynolds stated, "Ok, we're gonna go back there. Are you ok with us taking you inside and talking to you there?" *Id*. Defendant stated, "yeah." *Id*.

At that point, approximately 2 minutes into the recording, Reynolds referenced a form that she has shown to Defendant, which Reynolds explained to be "basically" the same thing she had already read to him. *Id*. at 1:58-2:16, Tr. at 30. She noted that Defendant would have to wait until he got to the apartment to sign it, but she indicated that he would need to print his name and sign. *Id*. At this point, the recording ended, which according to Witkowski was because he needed to assist uncuffing Defendant in or at the car so Defendant could sign a form. *Id*. at 68. 83-85.

The record is confusing, however, as to which form(s) Defendant was presented with at this juncture. Ultimately, Defendant signed two separate waiver forms: a *Miranda* waiver form, which bore the time 4:30 pm, and a consent to search form, which bore the time 4:35 pm. Reynolds explained that she initially recalled that the Defendant had not signed the *Miranda* form until reaching the apartment, but then after listening to the audio and reviewing the evidence her recollection was refreshed and she stated that Defendant had actually signed the

form *in* the car (which would be consistent with the 4:30 pm marking on the form). *Id*. at 30.

On cross-examination, Reynolds was asked why she believed Defendant signed in the car, when on the audio Reynolds advised Defendant that he would have to wait to sign until reaching the apartment. Reynolds explained that she believed this statement pertained to the second form, that is, the consent to search form, which Reynolds did not have available for Defendant to sign while in the car. *Id*. at 48-49.

In any event, the officers then took Defendant back to the apartment, which was only a brief drive. *Id*. at 31-32, 74. They did not force entry, although there was no evidence elicited as to how they entered. *Id*. at 32-33, 46, 81.

After Defendant was brought into the apartment, the officers then presented the Consent to Search form (Gov't Ex. 3) to Defendant. Tr. at 33, 57. There was no testimony of any other verbal advice or discussion about the form. The form stated, "I hereby voluntarily and intentionally consent to allow ICE to search my property. My consent is freely given and not the result of any promises, threats, coercion, or other intimidation. I have read the above statement and understand my rights." Gov't Ex. 3. Reynolds testified that she provided Defendant with the form, and provided him time to read it, but she did not otherwise go over it with him, and she did not know whether he actually read it. *Tr*. at 34.

Confusingly, when Reynolds first filled out the top portions of the consent to search form, she put in Defendant's name in the proper space for the person giving consent, and her name in the proper space as the officer advising him of his right to refuse consent, but then crossed all of those paragraphs out. Gov't Ex. 3, Tr. at 33-34, 37-38, 75-76. She testified that she did so because she believed she had made an error. *Id*. There was actually an error in the next line, in which Reynolds filled in Defendant's name as the ICE Special Agent who supposedly advised the Defendant that anything discovered in the search could be used against him. Gov't Ex. 3. Thus, Reynolds crossed this paragraph out too. *Id*. The form contained a third such error, as filled out by Reynolds, which was not crossed out. *Id*. Specifically, Reynolds again put the Defendant's name in the spot stating "I have decided to allow ICE Special Agents ***Demetrius Baker*** and [blank name] to conduct a complete search of [the residence]." *Id*. (emphasis added). Defendant signed this form, and Reynolds and Witkowski signed as witnesses. Gov't Ex. 3. The time on the form was 4:35 pm. *Id*.

Reynolds, who attested that she believed that the Defendant had already verbally consented to the search prior to arriving at the apartment, did not claim that the officers waited to begin the search until Defendant signed. According to Witkowski, by the time he entered the apartment, the Defendant was sitting on a couch and agents were already searching the apartment. Tr. at 86-88. At that point,

Witkowski also went back to a bedroom to see if the searching officers needed help. *Id*. Only after Witkowski returned was he was handed the form already signed by Defendant, which Witkowski then signed as witness (despite acknowledging at the hearing that he did not, in fact, witness the Defendant having signed). *Id*.

## II.    DISCUSSION

### A. *Motion to Suppress Evidence [28]*

A warrantless entry of an individual's home is presumptively unreasonable.[3] *See United States v. Tovar-Rico*, 61 F.3d 1529, 1534 (1995). Warrantless entries into and searches of such premises are permitted, however, where the prosecution proves that the police acted upon the voluntary and freely-given consent of a resident.  *See, e.g., United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989).

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *Id*. at 360. In considering whether a consent to search was voluntary, the Court must examine the totality of the circumstances. *Tovar-Rico*, 61 F.3d at 1535 (11th Cir. 1995); *see also United States v. Gonzalez*, 71 F.3d 819, 828-32 (11th Cir. 1996) (illustrating factors properly to be considered in totality of circumstances inquiry). Further, "'[t]he

_____

[3] The Government does not dispute that Defendant enjoyed a privacy interest vis-à-vis the premises searched and that he has standing to bring this motion.

government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.'" *United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (*quoting United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)). The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent." *Gonzalez*, 71 F.3d at 828 (*quoting Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)). *See also Florida v. Bostick*, 501 U.S. 429, 438 (1991) ("'Consent' that is the product of official intimidation . . . is not consent at all.").

> The Eleventh Circuit has identified a non-exhaustive list of relevant factors to consider when assessing the voluntariness of a consent to search: voluntariness of the defendant's custodial status, the presence of coercive police procedures, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found.

U*nited States v. Blake*, 888 F.2d 795, 798-9 (11th Cir. 1989).

The Government's case for establishing consent begins with the alleged pre-*Miranda* conversation between TFO Reynolds and Defendant, in which Defendant acknowledged having more drugs back at the apartment and, in response to Reynolds's request to allow the officers to retrieve that additional marijuana, Defendant said "yes."

At the outset, the Court cannot find that this minimal exchange would have provided consent to conduct a search of the apartment. All that Defendant was allegedly asked for, and all he supposedly provided, was authorization for the agents to "retrieve" a specific item. It was unsaid how the agents would "retrieve" the item, and it could have easily been Defendant's understanding that he would go with the agents to give them or point out this one item. Nothing about this conversation necessarily suggests that the Defendant was authorizing the agents to conduct an unbounded *search* throughout the apartment including in areas without any marijuana.

The Court also finds that the *Blake* factors do not warrant a finding of voluntariness based on this statement. This particular exchange allegedly occurred immediately after Defendant was suddenly pulled over by several officers in multiple vehicles, with guns drawn, and as or shortly after Defendant was apparently being handcuffed. In other words, the Defendant was in custody, subject to a clear showing of force, and there was no evidence at this juncture as to the Defendant's intelligence, willingness to cooperate, or knowledge of his right to decline consent. Since the Defendant had allegedly admitted that additional incriminating evidence would be found at the apartment, it follows that this *Blake* factor weighs against the Government as well.

In these circumstances, whether Defendant gave voluntary consent based on this conversation depends very significantly on the exact words that were spoken. On this point, the Government fails to submit sufficient proof to meet its burden. The only evidence submitted by the Government is the testimony of TFO Reynolds which (unlike many of the remaining statements) was not recorded. Indeed, the Government concedes that these critical, and incriminating, statements were not even memorialized in any investigative report. Nor, despite there being multiple other officers participating in this arrest, were these statements corroborated by any other witness testimony.

Notably, TFO Reynolds admitted as to other details of the incident that her own independent, unaided recollection was not accurate and that a review of the recordings and reports changed her recollection. The Court appreciates this candor, and it is quite understandable that any officer would lack completely accurate unaided recollection as to every detail in an incident that occurred 18 months previously. But that is precisely why matters as important as an arrestee's incriminating statements and/or waivers of Fourth Amendment rights should be, and usually are, memorialized at least in an investigative report. These circumstances make it hard to rely solely on TFO Reynolds's unrecorded and unmemorialized recollection on the consent to search.

Defendant points out other reasons by which he questions whether the conversation happened in the way Reynolds recalled at the hearing. Indeed, in the recorded part of the interview, Reynolds appeared to ask Defendant the same question she testified that he had already answered moments earlier ("do you have any other dope at the apartment"). *Id*. at 1:31-1:50. There is logic to Defendant's concern, that Reynolds would not likely have asked this question in this way if she had essentially already asked it and received an answer a few minutes earlier.

The Court has no basis to doubt the sincerity of the testimony. The Court simply finds that in the overall circumstances present here, the Government cannot sustain its burden to show what exactly was said at this initial juncture in the arrest, and in particular that Defendant willingly and voluntarily waived his Fourth Amendment rights during this unrecorded conversation.[4]

---

[4] Defendant also argues that the alleged conversation outside of the car was in violation of *Miranda* and therefore cannot be relied on to show consent to search. The Court agrees that the conversation, if it occurred as Reynolds recounts, would have violated *Miranda*. A *Miranda* violation, however, does not preclude a voluntary consent to search. The Eleventh Circuit has made clear that a defendant's consent can still be voluntary even after invoking Fifth Amendment rights against self-incrimination, because consent to search is not an incriminating statement. *United States v. Hidalgo*, 7 F.3d 1566, 1568 (11th Cir. 1993); *see Oregon v. Elstad*, 470 U.S. 298, 307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ("But the Miranda presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted."). Thus, although moot because suppression of the search proceeds is warranted on other grounds as explained above, the Court does not endorse suppression for the additional reason of a *Miranda* violation.

As for the recorded interview within the car, nothing about that conversation established consent to search either. All Reynolds said, after asking Defendant whether there were other drugs still in the apartment, was "Ok, we're gonna go back there. Are you ok with us taking you inside and talking to you there?" Ex. 1 at 1:31-1:50. At most, this suggests that Defendant consented to allow the officers *entry* for purposes of talking to them. A *search* of the apartment would have been outside the scope of this consent.

This brings the discussion to the consent-to-search form executed by Defendant. The circumstances regarding the Defendant's signing of this form are very confusing. As the Government bears the burden of proof, the Court must resolve the confusions and ambiguities regarding this form against the Government. When the Court does so, as explained below, the Court cannot find that this form shows knowing and voluntary consent by a preponderance of the evidence.

The officers acknowledged that they did not explain or discuss this form with Defendant, and that they did not know whether he actually read it. As noted above, while the testimony was very confusing on this point, Reynolds ultimately appeared to testify that it was this form that she referred to in the car, as the unidentified form that she advised Defendant he would have to sign later in the apartment. Tr. at 48-49. This would be consistent with Witkowski's testimony

(which was that the Defendant signed the *Miranda* form in the car), as well as the time stamps placed on the two forms, which suggest that the *Miranda* form was signed while they were still in the car, and that the consent-to-search form was signed several minutes afterwards, presumably in the apartment.

But the confusing paradox is that when Reynolds referred to the form to-be-signed later in the apartment, she appeared to tell the Defendant that it was "basically" the same thing that she had already read to him. All that she had read already to Defendant, however, were his *Miranda* rights.

Thus, viewed in the light most favorable to the Defendant's motion, he was told to print and sign his name on a form that was "basically" a restatement of his *Miranda* rights, but actually was something materially different – a waiver of Fourth Amendment rights and consent to search his residence. Especially without any other evidence that it was read to him or that he read it himself, the Court cannot find voluntariness based on the mere signing of this form on this record. Essentially, what this record suggests is that the Defendant may have been at least unintentionally misled, or led to be substantially confused, about what this form was for. Because the record suggests this possibility, and the Government did not disprove it, the Court must resolve the ambiguity in Defendant's favor.

The evidence as to the signing of this form is ambiguous is another important respect. The Government elicited no testimony as to whether the search

began before or after Defendant signed the form. The only testimony on this subject is from Witkowski, who explained that the Defendant was already sitting on the couch and the search was already underway by the time he (Witkowski) entered the apartment.  Witkowski was not handed the form to "witness" Defendant's signature until after he (Witkowski) had already walked all the way into the bedroom to check on the agents already conducting the search, and had returned to the front room where Defendant was sitting. This chronology suggests, as Defendant argues, that the agents may have begun the search before Defendant signed any consent form. Again, because the Government adduces no evidence to show otherwise, the Court assumes the facts in Defendant's favor on this point.

This detail is important, because it would further undermine a finding of voluntariness if Defendant was handed a consent form after a warrantless search of his apartment had already begun. A defendant who sees nearly a dozen agents already traipsing through his house and ignoring his Fourth Amendment rights would generally lack reason to believe that he could decline "consent" to a search that was already happening. *Tovar-Rico*, 61 F.3d at 1536 (where defendant "had already observed the officers explore every room in the apartment," she "could not reasonably have known that she could still refuse a search.")

On top of all of this, Defendant also places significance on the errors Reynolds made in filling out this form, including in putting the Defendant's name

as the name of the agent supposedly being authorized to conduct the search. The Court tends to agree with the Government, that these largely obvious typographical-style errors would not have been sufficient by themselves to undermine a finding of voluntariness. But given the various other issues discussed above, the Court cannot say that these errors may not have contributed, in a cumulative sense, to the confusion relating to Defendant's signing of this form.

Thus, the Court cannot find that the Government has shown that Defendant knowingly and voluntarily consented to a search of the apartment, and therefore must recommend suppression of the evidence phone within.

**B. *Motion To Suppress Statements [29]***

Defendant also argues that all of his statements from the moment he was placed in custody onwards should be suppressed as being obtained in violation of this Fifth Amendment rights and the prophylactic rules set forth by *Miranda v. Arizona*, 384 U.S. 436 (1966).

In *Miranda*, the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent and of his right to the assistance of counsel prior to any interrogation by law enforcement.  The Government has the burden to show the knowing and intelligent nature of a *Miranda* waiver. *Id*. at 475.  The Supreme Court instructs courts to look for two things:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than

intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation omitted).

The right to *Miranda* warnings attaches when custodial interrogation begins. *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004). The Supreme Court in *Miranda* explained that "custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. The Court subsequently defined "custody" in this context as a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks omitted).

Defendant argues that he was "in custody" pursuant to *Miranda* from the inception of the encounter with the officers, which began when several law enforcement vehicles stopped his car and TFO Reynolds ordered him out of the car and handcuffed him and then placed him inside her car. The Government does not contest that Defendant was in custody at this point.

The Government contends that in the brief moments after the Defendant was taken into custody, and before he was formally read his *Miranda* warnings, TFO Reynolds (a) noticed marijuana sitting on the roof of his car, (b) asked Defendant whether he had more drugs inside of his apartment (to which Defendant said "yes"), and (c) asked Defendant for permission to go retrieve those additional drugs (to which Defendant said "yes"). Tr. at 17-18. As noted above, Defendant argues that the evidence is insufficient to show that these statements were made, as Reynolds's claims are uncorroborated by any recording, other testimony, or even any notation in an investigative report, and are not consistent with the later recorded conversation. As noted above, the Court cannot find by a preponderance of the evidence that this conversation occurred at least as recalled by Reynolds at the hearing.

To the extent this unrecorded conversation occurred in the way described by Reynolds, however, there would have been a clear and apparently undisputed *Miranda* violation. The Government does not dispute that the Defendant was in custody during this time. Plainly, questioning a person arrested for possession of drugs as to whether he had "more" drugs in his apartment would have been reasonably likely to adduce incriminating information, and the Government does not argue otherwise. Thus, while the Court is not sure exactly what conversation occurred at this juncture, the Government should not be able to adduce testimony

that Defendant admitted to having "more" drugs in his apartment prior to being

*Mirandized*, because any such statements (if made) would have been obtained in

violation of *Miranda*. To this limited extent, the Court recommends that the

Defendant's Motion to Suppress Statements be granted.[5]

The Court, however, finds that the remaining interrogation generally

complied with *Miranda*. It is undisputed that the officers fully read Defendant his

*Miranda* rights, and that he indicated he understood them. Defendant's principal

---

[5] Defendant cursorily argues that "if" he had been asked in any unrecorded and unmemorialized pre-*Miranda* encounter with Reynolds as to whether he had more drugs in the apartment, then any responses to that same question after receiving *Miranda* warnings should be suppressed per *Missouri v. Seibert*, 542 U.S. 600 (2004). *See* Def. Br. [40] at 11. Generally, however, a prior un-*Mirandized* statement does not taint a subsequent statement that is preceded by a proper *Miranda* warning. *See United States v. Lopez-Garcia*, 565 F.3d 1306 (11th Cir. 2009). As the Supreme Court explained in *Seibert*, courts may find a violation in specific circumstances, where the facts suggest that the police deliberately schemed to circumvent *Miranda* by obtaining an un-Mirandized confession first, and then following that up with *Miranda* warnings and a repeat of the same questioning. *See Seibert*, 542 U.S. at 610-611. Defendant here does not make any particularized argument for application of this principle, and indeed Defendant conversely argues that the Court should not find that he was subjected to this line of pre-*Miranda* questioning at all.

Defendant therefore appears to assert this *Seibert* argument only in the alternative, that is, "if" the Court were to accept Reynolds's testimony as to the alleged unrecorded pre-*Miranda* discussion about allowing the officers to "retrieve" the additional drugs in the house. This hypothetical does not apply, because this Court has applied the facts in the light most favorable to Defendant and thus does not find that this discussion occurred in the way described by Reynolds. Said another way, the facts in this record do not suggest that Defendant previously admitted to having more drugs in the apartment, at the point when Reynolds asked Defendant in the recorded, post-*Miranda* discussion, that same question. For all of these reasons, *Seibert* does not apply here.

argument is that, in response to the warnings, he invoked his right to an attorney, and thus he contends that questioning should never have begun at all. The Court disagrees, as discussed below.

The government "does not need to show that a waiver of Miranda rights was express," because "an implicit waiver" is sufficient. *Hall v. Thomas*, 611 F.3d 1259, 1285 (11th Cir. 2010) (*quoting Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010)). The police must terminate the discussion if an arrestee invokes his *Miranda* rights, but any such invocation must be unequivocal and unambiguous to be effective. *Davis v. United States*, 512 U.S. 452 (1994). If "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," *Id*. at 452 (emphasis in original), the officers are not required to cease interrogation. Thus, statements such as "maybe I should talk to a lawyer," *id*. at 455, "maybe I should have one, but I don't know if it would do me any good at this point," *United States v. Medina-Cecelia*, 963 F.2d 1467, 1472 (11th Cir. 1992), and "I don't know what this is about just yet, but if it's something I'm not aware of, I'm probably going to want to have my lawyer present," *United States v. Garrett*, 805 F.App'x 709, 712 (11th Cir. 2020), are not unambiguous invocations of the right to counsel and therefore do not trigger suppression under *Miranda*.

According to the Defendant, the audio recording shows that after Reynolds asked whether he would speak without a lawyer, the Defendant essentially responded, "nah," and then said, "I have to get a lawyer." Defendant contends that this was an unequivocal invocation of the right to remain silent and all discussion should have ceased.

The full statement as reflected in the recording, Gov't Exhibit 1, is much more convoluted, however. After being asked whether he would talk to the officers without a lawyer, what the Defendant appeared to say was: "Uh I don't have, uh, naw, I'd have to get a lawyer." Gov't Ex. 1 at 0:59-1:18. As noted above, the parties appear to disagree as to whether Defendant said "I have to get a lawyer" or "I'd have to get a lawyer." The undersigned finds the latter ("I'd have to get a lawyer") to be more accurate. But to the extent this distinction is even material, at minimum it was certainly reasonable for an officer to understand Defendant to be saying "I'd" have to get a lawyer.

Either way, heard in its entirety, this statement could reasonably be interpreted as likely, or at least potentially, reflecting a misunderstanding of the question. After all, the initial statement "I don't have [a lawyer]," was not responsive to the question "would you talk to us without a lawyer." Mostly likely, it seems that Defendant believed he was being asked whether he *currently* had a

lawyer, because his response "I don't have [a lawyer]" would have been actually responsive to that different question.

To the extent Defendant misinterpreted the question in this or some other way, his remaining commentary, "I'd have to get a lawyer" (or even "I have to get a lawyer"), was part of the same non-sequitur response. In other words, the Court finds that this statement was, or could have been reasonably interpreted to be, a further non-responsive explanation as to his lack of current representation. Heard in this context, it is also ambiguous at best whether Defendant's use of the word "nah" was meant to say that he would not talk with the officers, or part of the same non-responsive statement that he did not currently have a lawyer.

Thus, at best, Defendant's statement *might* have reflected an invocation of the right to counsel. But it also *might* have been (and the Court believes more likely was) a confused response to a misinterpreted question. In any event, the response was at best ambiguous and therefore did not constitute a valid invocation of *Miranda* rights. *Davis*, 512 U.S. at 452.

Reynolds therefore was entitled to respond, by re-stating and clarifying the question. *Id*. at 00:59-1:18, Tr. at 22 ("ok, but the question is... do ... are you willing to talk to us without an attorney.") Defendant's response–"uh, yes, I guess, yeah. Do I have to like, what do I have to say? Yes, I'm willing, I guess"—was even farther from being a clear invocation of *Miranda* rights, and if anything

suggested an affirmative (albeit hesitant) willingness to talk. Although not necessarily required, Reynolds even offered a final reminder before any questioning: "just like what I read to you, if there is something you are not willing to answer, you don't have to answer." *Id*. The Court finds no violation with Reynolds proceeding with questioning on the basis of this exchange.[6]

### III.   CONCLUSION

Thus, the Court **RECOMMENDS** that Defendant's Motion to Suppress Evidence from the search of his apartment [28] be **GRANTED** and that Defendant's Motion to Suppress Statements [29] be **GRANTED** in limited part (as to any purported pre-*Miranda* statements) but otherwise **DENIED**.

---

[6] Defendant does not specifically argue that his statements were involuntarily made in violation of *Jackson v. Denno*, 378 U.S. 368 (1964). Nor does the Court *sua sponte* perceive a voluntariness issue as to his statements. By the time Defendant agreed to make statements, the officers had holstered all of their weapons, and there is no evidence of any threats or promises or misleading statements by the officers as to Defendant's rights. To the contrary, Reynolds advised Defendant of his right to remain silent verbally and by furnishing him the *Miranda* form, and reminded him that he could exercise his right at any time, even after he stated "Yes, I'm willing [to answer questions], I guess."

With no other matters to bring before the undersigned, the case is certified as ready for trial.

**IT IS SO RECOMMENDED** this 23rd day of 2022.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE