IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| v. | : | CASE NUMBER: |
| DEMETRIUS ALAN BAXTER, | : | 1:21-CR-417-JPB-JSA |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion to Suppress Evidence [69] ("Motion"). Defendant alleges that a private carrier, United Parcel Service ("UPS"), searched his package without a warrant at the instigation of and for the purpose of assisting the police, and thus violated the Fourth Amendment. After an evidentiary hearing, the Court **RECOMMENDS** that the Motion be denied.

### I.    FACTS

The Court held an evidentiary hearing and oral argument on May 1, 2023. Unless otherwise stated, the following facts were obtained during that hearing. *See* Transcript [80] ("Tr.").

Officer Stanley Jones of the Gwinnett County Police Department serves on the "interdiction team," and in that capacity "we go to FedEx, UPS, sometimes DHL Postal and we interdict drugs being trafficked." Tr. at 7. Although UPS is a

1

private company, Jones and other officers have been authorized by UPS management to be present inside UPS facilities, identify and research suspicious packages, and bring those packages to UPS security. *Id*. at 29-30. Officer Jones was present in the UPS transfer facility at Pleasantdale Road in Dekalb County on September 24, 2021. *Id*. at 8-9.

According to the relevant shipping agreement, UPS, as a private carrier, has the "right in its sole and unlimited discretion to open and inspect any Shipment tendered to it for transportation, but is not required to do so." Ex. 3 (2021 UPS Tariff/ Terms and Conditions of Service), § 6. Jones testified that if he were to identify a suspicious package likely to contain illegal drugs, he would bring that package to the attention of UPS corporate security staff, which would then make an independent judgment as to whether UPS would exercise its right of inspection. Tr. at 13. To the extent UPS chose not to open a particular package, Officer Jones would assess whether he would continue to investigate (including by presenting the package to a drug-sniffing canine) and request a search warrant to open the package himself. *Id*. at 13-14.

On September 24, 2021, Officer Jones observed the package in question in this case being unloaded via conveyor belt from a truck. *Id*. at 9. Jones quickly identified various suspicious indicia of drug smuggling, including that the package was heavily taped, from a drug-source state (California), was for next-day air with

an unusually heavy weight of 5 pounds, was dropped off at a UPS store for shipment, and was to a recipient with a generic name ("James Jones"). *Id*. at 9-10. After taking the package off the conveyor belt, Jones conducted searches in a law enforcement database and discovered that there was no such recipient associated with the delivery address, which is also an indication of drug smuggling. *Id*. at 10. Jones could also tell from the feel of the box that there was a second "box inside the box," which was consistent with the way drugs are packaged. *Id*. at 11. His research of the package took about 5 to 10 minutes. *Id*. at 11. At this juncture, "this box could have went out on the same box truck that it would have been if I took it off or didn't take it off." *Id*. at 25.

Jones thus brought the package (and others he had identified) to UPS security officer Jonathan Brown. *Id.* at 11-12. Although he had never been in law enforcement, Brown has worked with UPS in the security office for decades and had developed expertise in identifying suspicious packages likely to contain narcotics. *Id.* at 11-12; 43-45. Officer Jones presented the packages to Brown without any suggestion or request that Brown open the packages, for the purpose of allowing Brown to exercise his own judgment in that regard. *Id.* at 11-12; 56-60. Officer Jones, however, did advise Brown as to the results of his (Jones's) searches in law enforcement databases. *Id*. at 11-12. Brown later testified that he (Brown)

would not have had access to those particular databases, but "could go through my systems eventually and find [the same information] out." *Id*. at 74.

Brown explained that he decided to and did open the package, based on his own judgment as to the suspicious nature. *Id*. at 53-54, 56-60. He explained that Jones did not ask him to open the package and that "it was my decision 100 percent [to open the package]." *Id*. at 59. After it was opened and the apparent illegal nature of the contents was observed, Brown provided the material to Jones to allow for further law enforcement investigation. *Id.* at 58-59.

According to Brown, UPS inspects and sometimes opens packages for a variety of business reasons, including the need to protect the contents from being damaged, and to protect employees and the public from potentially harmful substances. *Id.* at 45-46. In cases of suspected drug smuggling, Brown explained that the company's principal purpose in preventing "bad things getting shipped through the company" was to provide "community service." *Id.*

According to Brown, he and other security staff sometimes inspect and open suspicious packages even without any police officer being involved. *Id*. at 56. In this particular case, however, the package was initially identified and brought to him by Officer Jones. Had Jones not done that, Brown acknowledged that the package otherwise would probably have been delivered. *Id*. at 66.

According to both Jones and Brown, UPS does not always decide to open packages identified as potentially suspicious by officers. *Id.* at 70-72, 75. The witnesses, however, differed in their recollection of how frequently UPS may decline such action. Jones estimated that he ultimately needed to obtain search warrants, apparently because the carrier declined to exercise its contractual right to open a package, in at least approximately 100 instances. *Id.* at 37-38. But when asked whether there were specific instances in which Brown declined to open a package, Jones could specifically think of one such instance. *Id.* Brown, by contrast, estimated that he declined to open packages specifically brought to him by Jones on at least over 10 or 20 occasions over the years. *Id.* at 71-75.

Jones explained that he concluded from his external examination of the package and the results of his database searches that the package was likely a shipment of illegal drug proceeds. Thus, had Brown not decided to open the package, Jones stated that he would have taken the next steps including presenting the package to his canine drug-sniffing dog and from there potentially requesting a search warrant. *Id.* at 14. Jones explained that he would only have presented the package to his canine if necessary, such as if Brown declined to open the package independently, because the suspected presence of fentanyl inside the package presented a potential hazard to the dog. *Id.*

## II.     DISCUSSION

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures.  U.S. CONST. AMEND. IV.  "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home [or other private property] without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980); *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000). A search by a private person or entity, however, does not implicate the Fourth Amendment unless that person or entity acted as an instrumentality or agent of the Government. *United States v. Ford*, 765 F.2d 1088, 1089-1190 (11 Cir. 1985) (*citing United States v. Jacobsen*, 469 U.S. 109, 113 (1994)).

The Defendant bears the burden to show that his Fourth Amendment rights were implicated by a particular action, and (if they were) the prosecution bears the burden to show that an exception to the Fourth Amendment's warrant requirement applies and that suppression should thus be denied. *See, e.g., United States v. Chavez*, 985 F.3d 1234, 1240 (10th Cir. 2021).

As noted above, Defendant argues that UPS acted as an instrumentality of law enforcement when it opened his package, and that this action violated his Fourth Amendment rights. The Government argues that the Fourth Amendment was not implicated by the actions of UPS, and that even if it were, suppression

should be denied on other grounds. The Court will address these issues individually.[1]

**A.** ***Was UPS's Search A State Action?***

It is undisputed that the Fourth Amendment does not apply to the private actions of commercial entities. However, the Eleventh Circuit has formulated a two-pronged analysis for determining whether a private person acted as an agent or instrumentality of law enforcement for Fourth Amendment purposes: (1) whether the government knew of and acquiesced in the invasive conduct, and (2) whether the private actor's purpose was to assist law enforcement rather than further its own ends. *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003). The Eleventh Circuit, in unpublished authority, has formulated the knowledge and acquiescence factor more precisely as requiring that the "government agent must also affirmatively encourage, initiate or instigate" the private actor's conduct. *United States v. Emile*, 618 Fed.Appx. 953, 955 (11th Cir. 2015) (per curiam) (unpublished).

---

[1] It is not contested, and the Court finds, that Defendant has standing to raise this challenge to the search of the package. Defendant has filed an affidavit attesting that the was the sole resident at the delivery address and that he was the intended recipient of the package. *See* Aff. [79-1]. Although the package was addressed to the apparent fictitious name, "James Jones," the Fourth Amendment confers standing on intended recipients of packages even those that use fictitious names. *See, e.g., United States v. Suarez*, 2021 WL 3667011 (S.D.Fla. August 18, 2021).

*Emile* also involved a UPS search. In that case, a UPS store manager became suspicious as to a particular package and called the police. A police officer arrived and advised the store manager not to open the package on behalf of the police but suggested that he (the manager) had the contractual right to inspect all packages including by opening them. *Id*. at 954. The officer, nevertheless, also affirmatively informed the manager that he (the officer) smelled raw marijuana. *Id*. The Court found that the "manager decided – based on his own suspicions and as a matter of UPS company policy – to open the packages himself," and that the officer "did nothing significant" to encourage this action. *Id*. at 955. Thus, the Court found that the Fourth Amendment was not implicated by this intrusion. *Id*.

The Government first argues, pursuant to *Emile*, that Brown's actions were based on "his own suspicions and as a matter of UPS company policy" and that Jones did nothing "significant" to instigate or encourage this action. The Court cannot agree as to the second point, that is, the lack of police instigation.

Unlike in *Emile*, Jones initiated this entire chain of events by removing the package from the delivery conveyor belt and affirmatively bringing it to Brown. Jones may not have expressly voiced a suggestion that the package should be opened, but that message was at least implicit in the context here. Indeed, Jones also affirmatively told Brown that he (Jones) discovered through law enforcement databases that the recipient name/address combination was fictious. These facts are

distinguishable from those in *Emile*, in which the chain of events was initiated by UPS store manager. Here, as Brown acknowledged, this package would likely not have been identified and set aside had Jones not intervened. The Court thus finds that the first prong of *Steiger*, that law enforcement knew of and acquiesced to the search, and/or affirmatively encouraged and initiated it, is satisfied.

As explained above, however, Defendant must also show that UPS's conduct was undertaken for the purpose of helping the officer, not for its own policies and purposes. The Court finds that the Defendant's motion fails on this point. Brown clearly explained that he made his own decision in exercising the company's right to open the package. The written policies and shipping contracts similarly state that UPS "reserves the right in its **sole** and unlimited discretion to open and inspect any Shipment tendered to it for transportation but is not required to do so." Ex. 3 § 6 (emphasis added).

Brown initially explained that the company had a business interest in inspecting and interdicting hazardous materials for the safety of employees, customers and the community. Brown, however, then appeared to acknowledge that in the case at least of suspected drug smuggling, the company's principal purpose in inspecting and opening packages is a bit more generalized: as a "service to the community."

Of course, such a good-Samaritan motivation overlaps with law enforcement's mission. But the Court cannot find that a company's motivation to be or present itself as a good corporate citizen necessarily makes it a state actor. A corporation may wish to avoid being used as an instrumentality for illegal activity for any number of its own purposes, whether based on the altruism of its management, to promote good public relations, to avoid liability, or some combination of those or other reasons. The Court cannot find, on the facts here, that UPS had no independent, private purpose in taking the action that it did, even if that purpose intersected with the police's mission.

Notably, there was no evidence presented of any reason UPS had to acquiesce to any suggested search by the officer, or that Brown received or felt any pressure to do so. Nor was there any evidence to suggest that UPS had reason to curry favor with the police in this effort. Indeed, while the witnesses differed in their recollection of how many times UPS declined to search packages in similar circumstances, both Brown and Jones testified that UPS (and Brown specifically) has done so on other occasions. It is also relevant that UPS is a large, sophisticated corporation, and that Brown specifically had decades of experience in corporate security. It is not likely that they would feel pressure or intimidation from the presence of a policeman and the evidence does not suggest that they did.

Thus, in the end, the Court cannot find that Defendant has borne his burden to show that UPS was acting as an arm or instrumentality of the Government when it exercised its contractual right to open the package. Brown made the decision on his own, based on the company's policies, procedures and purposes to not be party to drug smuggling. This decision did not implicate the Fourth Amendment.

**B.  *Was Any Fourth Amendment "Search" By UPS Based On Consent?***

Even if UPS's search equated to state action, the Government alternatively argues that the Defendant lacked a privacy interest in the package and/or that any search was consented-to, based on UPS's contractual right to open and inspect any package. The Court agrees with this alternative argument as well.

The Eleventh Circuit's decision in *United States v. Young*, 350 F.3d 1302 (11th Cir. 2003) is instructive if not controlling on this issue. In *Young*, the Internal Revenue Service ("IRS") had identified certain Federal Express packages that were believed to contain cash proceeds of a tax fraud scheme. Unlike here, Federal Express never made an independent corporate decision to open the packages. Rather, Federal Express simply handed those packages over to the IRS, which then proceeded to x-ray the packages to reveal the contents. *Id*. at 1304-1305. There was no question that this action constituted a warrantless governmental search.

Yet the Eleventh Circuit found that there was no Fourth Amendment violation. The Court reasoned that the Defendant in that case, who was the sender,

lacked a sufficient privacy interest in the package by sending it via a third-party commercial carrier (Federal Express) pursuant to contractual terms whereby the carrier reserved an unqualified "right to inspect" the contents of any package. *Id*. at 1307-8. Relatedly, and in the alternative, the Eleventh Circuit also found that Federal Express had the authority to consent to the IRS's search of the package because the sender inherently "authorized Federal Express, as the bailee of the packages, to consent to search." *Id.*

Defendant first attempts to distinguish *Young* by pointing out that Federal Express's "right to inspect" notice was present on the airbill label itself (albeit on the backside), and that the airbill also separately stated that cash was not permitted in the envelopes. Defendant argues that UPS's equivalent language here was less conspicuous, as it was included not on either the front or back of the label but rather in a separate document – the "Tariff/Terms & Conditions of Service" – that a customer would have to separately access from the internet or otherwise.

The Court does not perceive a sufficiently material distinction to warrant a departure from *Young*'s holdings. After all, the face of the UPS shipping label on Defendant's package expressly referred to and incorporated the UPS Terms. *See* Gov't Ex. 1. The Court cannot find that the difference between providing notice in this fashion versus including the term on the backside of a mailing label is so great

as to warrant a different result. Either way, any customer would have been put on notice that their package was subject to a "Right To Inspect."

Defendant's second argument to distinguish *Young* is that *Young* involved a motion to suppress by the sender of a package, whereas Defendant in this case was the recipient. The parties have not cited any cases applying the principle of *Young* to the alleged Fourth Amendment rights of a package recipient. Defendant, of course, has a point that the *recipient* of a package is not present when the sender agrees to ship the package via a carrier such as UPS pursuant to its "terms." Thus, while the sender may have chosen to send the package pursuant to the carrier's unqualified "Right to Inspect," the recipient was not necessarily aware of this. Thus, according to Defendant, the recipient's expectation of privacy should not be diminished by the sender's choice to send the package via a commercial carrier.

The Court disagrees with Defendant's argument, at least on the facts here. The Court cannot find that the recipient's expectations of privacy should truly be greater than the sender's, simply because the recipient may have kept himself ignorant of how the sender arranged to send the package. The evidence adduced in this case and reflected in other cases such as *Young* suggest that there is nothing unusual that UPS enjoyed a right to inspect here. To the contrary, that term is standard in UPS's business and apparently is also so for other commercial carriers such as Federal Express. By ceding control of the shipping arrangements to another

party, Defendant thus assumed the substantial risk that those arrangements, if through a commercial carrier, would give that carrier a "right to inspect."

But in the end the Court need not necessarily find that Defendant's expectations of privacy in this package were diminished. As noted above, *Young* rested on the additional, alternative, theory, that the shipping arrangements authorized the carrier to consent to a government search. The same holding applies even more clearly here. Even if Defendant were unaware of the arrangements, the sender, by agreeing to the UPS Terms & Conditions, allowed UPS to "open and inspect the package," in its "unlimited discretion." Because the consent to UPS to open and inspect the package was "unlimited," it necessarily included any decision by UPS to do so for purposes of assisting law enforcement. The sender's consent alone was sufficient to allow UPS to take this action even if UPS were acting as a state instrumentality. *See United States v. Flores*, 55 F.4th 614, 619 (8th Cir. 2022) (finding that officers had valid consent to open a package after calling the phone number of the purported sender and receiving that person's consent-to-search, and thus denying a motion to suppress later asserted by the recipient after a controlled delivery, because "consent sufficient to search a mailed package may come from the actual sender or recipient, or from an individual that officers reasonably believe to be the sender or recipient.") (citing *Illinois v. Rodriguez*, 497 U.S. 177, 188-89, (1990) (finding that police had reasonable basis to believe they had consent to

search a premises based on the permission of a person they believed to be a co-tenant with apparent authority to consent).

## C. *Was Any Search By UPS The Fruit Of An Unlawful "Seizure"?*

Alternatively, even if UPS validly opened the package pursuant to its own decision and authority to do so, Defendant argues that all of these events resulted from Officer Jones's initial warrantless "seizure" of the package from the conveyor belt. Defendant characterizes this act alone as a Fourth Amendment violation, and that the subsequent inspection by Brown was a fruit of this initial violation. This argument is meritless on several grounds.

First, Jones's brief detention of the package did not rise to the level of a seizure implicating the Fourth Amendment. "A seizure of property occurs when there is a 'meaningful interference' with a person's possessory interest in it." *Crocker v. Beatty*, 886 F.3d 1132, 1136 (11th Cir. 2018) (*quoting United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007)). A brief detention of a package, piece of luggage, or item of mail that does not in itself delay delivery or otherwise prejudice any possessory interest does not implicate the Fourth Amendment. *See, e.g., United States v. Puglisi*, 723 F.2d 779, 787 (11th Cir. 1984) ("a seizure of luggage qua seizure, with no deleterious effects on the air traveler, is simply not a fourth amendment issue"); *United State v. Lovell*, 849 F.2d 910, 916 (5th Cir.1988) (no seizure of luggage when it was briefly detained because no interference with

possessory interest); *United States v. England*, 971 F.2d 419 (9th Cir.1992) ("we need not consider whether the postal inspectors had reasonable and articulable suspicion to seize the package before they obtained the search warrants, because until the packages were searched pursuant to those warrants, no seizure occurred"); *United States v. Johnson*, 990 F.2d 1129, 1132 (9th Cir.1993) (defendant's "only interest was that the airline, as his bailee, would place his luggage on the next plane, which was to leave about two hours after his plane. The entire process of removing the luggage from the cart, taking it from one office to the other, and having the dog sniff it, was completed prior to the time the luggage would have been placed on the airplane"); *United States v. Wood*, 6 F.Supp.2d 1213, 1224– 1225 (D.Kan.1998) (defendant's only possessory interest in Federal Express package was "'the contract-based expectancy that the package would be delivered to the designated address'" within a reasonable time; court concluded that if the government's "assumed detention of the package for investigative purposes did not delay the likelihood or probability of its timely delivery, then there was no meaningful interference with the individual's possessory interest in it"); *United States v. Quoc Viet Hoang*, 486 F.3d 1156, 1160–62 (9th Cir. 2007) (no seizure when the package was detained ten minutes because recipient was not deprived of possessory interest and interference was minimal).

Here, all Officer Jones did was take the package off the conveyor belt and bring it to Brown for his independent judgment as to whether to open it. This was a brief, *de minimus*, detention akin to those deemed not to be Fourth Amendment seizures in all of the above cases, or at least Defendant does not show otherwise. Further, even if Jones's actions amounted to a seizure implicating the Fourth Amendment, his presence in the facility to identify potentially suspicious packages was invited and consented-to by the then-current custodian and bailee of the package, that is, UPS. Clearly, Jones's actions did not exceed the authority and consent that UPS granted to him.

Finally, brief investigative seizures by law enforcement are permitted if supported by reasonable suspicion of criminal activity based on specific, articulable facts. *See United States v. Babcock*, 924 F.3d 1180, 1188 (11th Cir. 2018). Here, Jones testified that his attention was immediately drawn to this particular package. It was heavily-taped and double-boxed, which was common for drug-containing packages, and from a high-source area, that is, Los Angeles. A brief initial detention likely on the order of a few minutes, if that, allowed him to see the generic recipient name and also discover that the name and address did not match up. This combination of facts, while not necessarily rising to the level of probable cause, constituted a sufficient basis for reasonable suspicion warranting a brief additional "seizure" to bring the package to the attention of corporate security

and, if necessary afterwards, to conduct a canine sniff test. For all of these various independent reasons, the search is not suppressible as the fruit of an illegal seizure.

### D. *Inevitable Discovery*

As a final alternative, the Government argues that even if UPS's actions constituted an illegal governmental search or the fruit of an illegal seizure, suppression should still be denied on the basis of inevitable discovery.

Under the doctrine of inevitable discovery, the exclusionary rule does not apply to illegally-obtained evidence, if that evidence "inevitably or ultimately would have been discovered by lawful means without reference to the police misconduct." *United States v. Terzado-Madruga*, 897 F.2d 1099, 1113 (11th Cir. 1990).  However, the "[G]overnment bears burden of showing, by reference to 'demonstrated historical facts' and by a preponderance of the evidence, that the information or item would inevitably have been discovered by lawful means." *United States v. Infante–Ruiz*, 13 F.3d 498, 503 (1st Cir. 1994).  The Government must also show that law enforcement possessed and was actively pursuing the lawful avenue of discovery when the illegality occurred.  *See United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007).

As explained above, Officer Jones immediately identified this package as suspicious based on various specific and articulable facts. According to Officer Jones, had Brown not opted to open and inspect the package on behalf of UPS,

Jones's next step would have been to present the package to the drug-sniffing canine that was in Jones's patrol vehicle just 100 yards or so away. Assuming the dog were to have given a positive alert, Jones would have presented a request for a warrant to open the package.

The Court declines to find that the evidence presented here satisfies the Government's burden on the rather exacting standards to show inevitable discovery. In the end, the evidence does not directly show that Jones would have obtained a warrant, but rather that he would continue to investigate by presenting the package to his canine. But the Court heard very little evidence as to the canine's training, certifications and track record such as to be able to make a finding, by a preponderance of the evidence, that the dog would have detected the narcotics. Moreover, it was later discovered that the narcotics were being secured in tightly sealed inner box within the tightly sealed outer box, Russian-doll style, likely for purposes of trying to defeat the talents of drug-sniffing canines. The Court heard no evidence to support the assumption that the canine, even if certified, well trained and effective, would have likely been able to detect the drugs in these circumstances. The Court finally heard no evidence as to what Jones's course of action would have been had the dog not alerted to the presence of drugs, and the Government does not argue that the other facts would suffice to support a

warrant. For all of these reasons, the Court cannot find that inevitable discovery would save the evidence from suppression.

However, ultimately, the inapplicability of inevitable discovery is moot, because the Court does not find any Fourth Amendment violation in the first place. The Motion [69] should be denied.

## III.   CONCLUSION

It is **RECOMMENDED** that the Motion to Suppress [69] be **DENIED**. The matter is again certified as **READY FOR TRIAL**.

This 11th day of May, 2023.

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE